FILED'11 APR 06 12:10USDC-OR

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

UNITED STATES OF AMERICA,                        Crim. No. 10-199-HA

    Plaintiff,                                   OPINION AND ORDER

    v.

MICHAEL MARCEAU, and LISA FORD,

    Defendants.

_____

HAGGERTY, District Judge:

    Defendants Michael Marceau and Lisa Ford have been charged with twenty-seven counts regarding the production and possession of child pornography, and the involvement of a minor in the production of child pornography by a parent or guardian. Defendants filed several pre-trial motions seeking discovery, dismissals, severance, and the suppression of evidence and statements.

    This court held evidentiary hearings on February 22, and March 8, 2011, at which law enforcement officers and defendants presented testimony. During the hearings, this court issued rulings on all motions except defendants' motions to suppress their statements. On March 31, 2011, defendant Marceau pled guilty to all counts in the Superseding Indictment. At his plea hearing, Marceau withdrew his suppression motion. Accordingly, Marceau's Motion to Suppress Statements [43] is denied as moot.

1 - OPINION AND ORDER

Following the evidentiary hearing, this court accepted exhibits, charts, a copy of the transcript from the first day of the hearing, and a supplemental brief from defendant Ford. For the following reasons, defendant Ford's Motion to Suppress Statements [38] is DENIED.

**FACTUAL BACKGROUND**

The government's investigation in this case arose from e-mails transmitted between Marceau and an employee of the United States Department of Interior's Bureau of Indian Affairs. After these e-mail messages were discovered, the matter was referred to the Immigration and Customs Enforcement (ICE). Based on the e-mail messages and information from administrative subpoenas, ICE agents obtained a federal search warrant for Marceau's home. The home was shared by Ford.

Eight ICE agents executed the search warrant at defendants' home in Aloha, Oregon around 9:35 a.m. on February 19, 2010. The agents were armed and uniformed in bulletproof vests or other identifying clothing marked as "ICE" or "Police." An officer knocked on the door and Ford answered the door. The agents told her that they were executing a search warrant and needed to come inside. Ford agreed. The agents asked her where Marceau was located, and Ford directed the agents to the master bathroom. Ford was dressed in her bathrobe, so the agents allowed her to dress. Two female agents stayed with Ford while she dressed.

Ford was escorted into the living room and was advised that she was not under arrest. Officer Josh Findley told her that she was free to leave, but that if she left, she could not return until after the search was completed. Officer Findley read portions of the search warrant to Ford. He asked her if she would speak with the agents, and Ford consented. At this point, the agents were interested in interviewing Ford as a witness.

The agents then separated Ford from her husband to speak with her. They asked where they could speak privately, and Ford suggested her daughter's bedroom. Two agents escorted Ford into the bedroom. The door to the bedroom was never locked, but may have been partially closed. It is unclear whether agents ever stood in front of the door.

No warnings were given pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The agents questioned Ford about Marceau's involvement with child pornography and asked her whether Marceau had engaged in any sexual activity with children. Although Ford may not have initially understood what "activity" meant, she admitted that she and Marceau had taken photographs of her children (a six year-old girl and a severely disabled fourteen year-old boy) while both defendants sexually abused them. Ford's interview lasted between thirty and forty-five minutes.

Following her admissions, Officer Findley met with Ford in the hallway outside of the daughter's bedroom. Officer Findley provided Ford with *Miranda* warnings he read from a card. Ford reportedly said that she understood, and waived her rights. Officer Findley asked Ford to repeat the statements she made to the other agents, and she again made incriminating statements. Ford repeated her admissions following additional *Miranda* warnings during a third interview with Washington County officers later that day, which was recorded. Throughout the duration of the interviews, ICE agents searched Ford's home and seized items described in the search warrant.

## DISCUSSION

Ford moves to suppress all statements obtained from her during the in-home interrogation on February 19, 2010. She asserts that she was "in custody" when the initial interview was conducted without *Miranda* warnings, and that the later warnings were invalid. Ford asserts that

she could not leave her medically-fragile child who requires constant care. Ford initially

challenged the voluntariness of her statements, but withdrew that argument during the hearing.

The government responds that Ford was not in custody for *Miranda* purposes until after

she admitted to sexually abusing her children. The government denies that an improper two-step

interrogation process was used to obtain statements from Ford prior to providing her with

*Miranda* warnings.

### 1.    Custodial interrogation

If a person is in custody and subject to interrogation, he or she must be given the four

warnings enunciated in *Miranda v. Arizona. United States v. Bassignani*, 575 F.3d 879, 883 (9th

Cir. 2009). To determine whether a person was in custody, the court must decide, based on the

totality of the circumstances, whether there was "a formal arrest or restraint on freedom of

movement associated with a formal arrest." *Id.* (citations omitted). A defendant is considered in

custody if a "reasonable innocent person in such circumstances would conclude that after brief

questioning he or she would not be free to leave." *Id.* at 883 (quoting *United States v. Booth*, 669

F.2d 1231, 1235 (9th Cir. 1981)).

The Ninth Circuit directs this court to examine five non-exhaustive factors in its custody

determination, including (1) the language used to summon the individual; (2) the extent to which

the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain

the individual. *Bassignani*, 575 F.3d at 883-84. A finding of non-custodial interrogation should

be made if the defendant voluntarily accompanies the officers into an interrogation room absent

an order, the interview was conducted in an open, friendly tone with familiar surroundings, and

the defendant was told that he or she was free to leave. *Id.* at 884-86 (discussing Ninth Circuit precedent relevant to each of the factors).

If a suspect is interrogated in his or her own home, the third factor generally weighs in favor of finding a non-custodial atmosphere. *See United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) (noting that courts are less likely to make a custody finding when a suspect is interrogated in his or her home). However, if the police take over the defendant's home or business in such a way to create "a police-dominated atmosphere," a finding of custody may be warranted. *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002).

The court must therefore consider additional factors when the suspect is interrogated at home. These factors include:

> (1) the number of law enforcement personnel and whether they were armed;
>
> (2) whether the suspect was at any point restrained, either by physical force or by threats;
>
> (3) whether the suspect was isolated from others; and
>
> (4) whether the suspect was informed that he or she was free to leave or terminate the interview, and the context in which such statements were made.

*Craighead*, 539 F.3d at 1084.

Ford asserts that the circumstances of her interrogation are analogous to *Craighead*, and that this court must find that she was in custody. In *Craighead*, eight law enforcement officers representing three different agencies entered the defendant's home on a military base. *Id.* at 1085. The defendant's Air Force superior also accompanied the officers to provide emotional support for the defendant. *Id.* at 1085, 1087. All of the officers were armed, some were wearing protective gear, and some had their weapons unholstered. *Id.* at 1086. Although the defendant was not physically restrained, he was escorted into a back storage room for questioning where the

5 - OPINION AND ORDER

door was closed behind him. *Id.* While inside the storage room, one of the detectives wearing a
flak jacket and a visible firearm "appeared to him to be leaning with his back to the door in such
a way as to block [the defendant's] exit from the room." *Id.*  The officers did not permit the
defendant's superior to accompany the defendant into the storage room even though he was
present to lend moral support to the defendant. *Id.* at 1087. The defendant was told that he was
not under arrest and that he was free to leave. *Id.* However, the defendant testified that he did
not want to leave the officers alone with his belongings or leave his dog unattended. *Id.* at 1089.

    After evaluating all the factors, the Ninth Circuit held that the defendant was not free to
leave. *Id.* at 1089. The court relied on the number of officers present and the intimidating, non-
familiar atmosphere inside of the back storage room. *Id.* The court noted that the presence of
three agencies led the defendant to reasonably doubt whether he was truly free to leave because
the agencies may have not agreed to release him, or the officer advising him may not have had
full authority to make that decision. *Id.* at 1085, 1088. The court also relied on the defendant's
testimony that to terminate the interview, he would have been required to move the detective
blocking the door or ask him to move away from the storage room's only exit. *Id.* at 1086.

    To determine whether the totality of circumstances in this case constituted a custodial
interrogation, this court must analyze the four factors from *Craighead*.

### A.    Number of law enforcement personnel and whether they were armed

    Eight ICE agents arrived at Ford's home to execute the search warrant. All of the agents
were armed and were wearing bulletproof vests or other marked protective clothing. One officer
testified that he may have had his hand on his firearm during the protective sweep of the home.
The other agents testified that they did not believe they ever unholstered their weapons inside the
home, but they could not be certain. Ford testified that she never saw a gun out of its holster.

6 - OPINION AND ORDER

The number of law enforcement officers in Ford's home contributed to a police-dominated atmosphere. However, the testimony from the officers and defendants describes the scene as low-key and polite. The agents did not shout or attempt to break down the door. Officer Findley also testified that he removed his bulletproof vest prior to speaking with Ford. This court concludes that despite the number of officers inside the home, the demeanor of the officers and the absence of unholstered weapons weighs against a custody finding.

### B.    Restraint

Ford testified that she was never physically restrained or handcuffed. She was allowed to get dressed in the presence of two female officers. Ford was also allowed to move around the house, use the restroom, and care for her disabled son in the company of at least one agent. The agents purportedly believed that escorting Ford inside the home was necessary for officer safety and to prevent the destruction of evidence during the search. However, as the Ninth Circuit observed, "[t]he fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." *Craighead*, 539 F.3d at 1086. The constant supervision of Ford weighs in favor of a custody finding.

### C.    Isolation

Ford was intentionally isolated from her husband during her interviews. Officer Findley testified that he often separates spouses during a search related to child pornography because the wife is often upset and disturbed by the circumstances of the search.

The agents then asked Ford where they could speak privately, and Ford suggested moving to her daughter's bedroom. The agents testified that they never closed the door to the bedroom and never physically blocked the door. Ford testified that the agents partially closed the door after her husband tried to signal her. Marceau testified that he had a clear sight line from the

hallway to where Ford was located in the bedroom. Based on the testimony, this court concludes that the door was ajar enough for Ford to view the hallway outside of the bedroom and that the agents never physically blocked the door.

Ford's isolation from her husband could weigh in favor of a custody finding. However, Marceau was not present in the home to specifically provide emotional support to Ford. *Cf. Craighead*, 539 F.3d at 1087. Rather, Marceau was the target of the agents' investigation. Moreover, Ford was not isolated inside a closed room with a law enforcement officer blocking the sole exit. At best, the isolation factor weighs equally on the custody determination.

### D.    "Free to leave" and the context in which the statement was made

Ford was informed that she was free to leave at least once prior to her interview. As the Ninth Circuit explained, "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation noncustodial per se." *Id.* at 1088. Ford was also told, in conjunction with the notice that she was free to leave, that if she decided to leave she could not return until the search was completed. Although this latter statement arguably served a valid law enforcement interest, it also altered Ford's ability to voluntarily leave her home. Ford's disabled son required constant care. If Ford chose to leave her home and not speak with the agents, she would have been unable to provide the necessary assistance to her son. This factor weighs in favor of a custody finding.

### E.    Totality of circumstances

Ford was not ordered to speak with the agents. Ford suggested her daughter's bedroom as a private place to speak with the agents, and she voluntarily accompanied the agents to the bedroom. Ford's interview lasted between thirty and forty-five minutes in a brightly lit bedroom accompanied by familiar surroundings. Ford was not forced into the dark recesses of a storage

8 - OPINION AND ORDER

closet without furniture, and was therefore able to "take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." *Id.* at 1088. Although Ford's attorney persuasively argued that Ford may have felt less comfortable in her daughter's bedroom because of her concerns for her children and the nature of the questioning, this court concludes that the familiar surroundings of the bedroom objectively decreased the police-dominated atmosphere.

Ford also testified that she folded laundry while answering the agents' questions, and hung up her daughter's clothes in the closet. These familiar activities also diminish the custodial nature of the interview.

Notwithstanding the factual similarities with *Craighead*, this court finds that Ford was not in custody at the time she was interviewed. Ford's interrogation lacks the highly coercive factors relied upon in *Craighead*, including the isolated atmosphere in the closed storage room and the armed detective blocking the interrogation room's sole exit. The Ninth Circuit's recent reversal of a district court's custody finding is instructive. In the case, the district court found that the defendant was in custody when he was confronted by seven federal agents with weapons drawn executing a federal search warrant at his home at 6:53 a.m., the defendant was physically restrained outside of his apartment dressed in a T-shirt and underwear and not permitted to get dressed, the defendant was told that he was free to leave while surrounded by armed agents, and the defendant was thrice denied a request to speak with an attorney. *United States v. Dierking*, No. 08cr3366 JM, 2009 WL 648922, at *5-7 (S.D. Cal. Mar. 9, 2009), *reversed and remanded by United States v. Dierking*, 359 Fed. App'x 823, 825 (9th Cir. 2009). Even though several factors in *Dierking* weighed heavily in favor of a police-dominated atmosphere, and appear more coercive than in Ford's case, the Ninth Circuit reversed the district court's custody determination

9 - OPINION AND ORDER

because the defendant was "not isolated in a storage room with the door blocked by an agent . . . [and] [n]o agents blocked him from retreating outside his apartment or to elsewhere in the apartment where he could be by himself." *Dierking*, 359 Fed. App'x at 825.

In its reversal, the Ninth Circuit gave weight in *Craighead* to the isolation of the back storage closet and the intimidating nature of the agent blocking the room's only exit. These crucial factors are absent in this case. Ford was not physically blocked inside the bedroom by a closed door or an armed agent's imposing presence. Ford was able to move around the room to fold and hang up laundry, she was able to leave the room to care for her son, and she able to see into the hallway.

Ford was also never confronted with evidence of guilt during her interview. The agents testified credibly that they had no reason to suspect that Ford was involved in her husband's child pornography crimes prior to the search, and had no reason to believe that either defendant had abused the children prior to Ford's interview. Although Ford's name was associated with the internet protocol address from which Marceau sent the incriminating e-mails, the agents reasonably believed that Marceau was the only person involved in the sexual exploitation of children.

Additionally, Ford's scenario lacks the presence of law enforcement officers from three different agencies. The Ninth Circuit found this fact vital to its custody determination because the defendant had reason to doubt whether he was truly free to leave, or whether he would be confronted by members from other agencies. *See Craighead*, 539 F.3d at 1088.

After examining the totality of the circumstances, this court concludes that a reasonable person in Ford's circumstances would not have felt that she was in custody.

2.    **Two-Step Interrogation**

Because this court finds that Ford was not in custody for *Miranda* purposes at the time she was interrogated, the court need not address the allegedly improper two-step interrogation process. *See Thompson v. Runnel*, 621 F.3d 1007, 1017-18 (9th Cir. 2010) (stating that the court should consider whether the officers deliberately withheld *Miranda* warnings if the interrogation became custodial before the admission was made). Nevertheless, after examining the record, this court concludes that the agents did not deliberately withhold *Miranda* warnings from Ford. Ford was not in custody during her initial interview, and the agents did not suspect that she was involved in any criminal activity.

Ford does not dispute that her post-warning statements were voluntarily made. Accordingly, her post-warning statements are also admissible. *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007) (holding that "post-warning statements are admissible if voluntarily made") (citation omitted).

## CONCLUSION

For the reasons provided, defendant Ford's Motion to Suppress Statements [38] is DENIED. Defendant Marceau's Motion to Suppress Statements [43] is DENIED as moot. Counsel are directed to confer and then contact the court to schedule a hearing to reset the trial date regarding defendant Ford.

IT IS SO ORDERED.

DATED this 6 day of April, 2011.

Ancer L. Haggerty
United States District Judge

11 - OPINION AND ORDER